ROBERT BERRY, complainant,

*v.*

THOMAS E. STEWART et al., defendants.

[Decided October 22d, 1925.]

NOTE—Syllabus in this case has not yet been officially approved by the court.

Sale of Land—Specific Performance by Vendor Asked—Tender Not Made Until Day Following Day Fixed in Agreement For Delivery—Provision Making Time the Essence of Contract Not Included Therein—Defendant Offered Much Testimony to Prove That Time Was of Essence—Defendant Did Not Call Complainant's Attention to Time, and Evidently Hoped That Settlement Would Not Be Made—Held, That Delay Was Through Error, That Complainants Were Ready to Perform Contract and that Testimony That Time Was of the Essence is Not Convincing.

On bill for specific performance. On final hearing.

*Mr. John C. Reed,* for the complainant.

*Mr. William Charlton,* for the defendants.

INGERSOLL, V. C.

On the 23d day of February, 1923, the defendant Thomas C. Stewart, being the owner of a tract of land in Atlantic City, described in the bill of complaint, entered into an agreement in writing with the complainant, wherein he agreed to convey said lands and premises to the complainant for the sum of $12,000. The consideration was to be paid—$500 upon the signing of the agreement, the assumption of a mortgage then existing of $4,500—$3,500 in cash upon the delivery of the deed, and the creation of a purchase-money mortgage for $6,000, payable within one year.

The settlement and the delivery of the deed was to be made on or before April 23d, 1923.

William Charlton, the solicitor of the defendant Stewart, is an equitable owner of an undivided one-half of the premises in question. Mulock, the manager of Berg & Ulizio, real estate brokers in Atlantic City, testified that Stewart & Charlton listed for sale, among other properties, the said land in the office of Berg & Ulizio.

On the day in question Mulock notified Mr. Charlton's office that he had a purchaser for the land. In response to this notice Charlton & Stewart called at the real estate office, and Mulock submitted an offer which was accepted. Mulock then presented Berry's check for $500 and the contract for sale, which had been signed by Berry and was in Mulock's possession. The agreement called for settlement sixty days from the date of the agreement.

Mr. Charlton testified that he and Stewart called at the real estate office about five o'clock on the said 23d day of February, 1923, in reference to certain property owned by Berg, and met Mr. Berg of the firm, Mr. Mulock and Mr. Roberts, a salesman. He denied that this property was listed with the firm, but that he knew Mulock "was going to try to sell them."

Roberts informed them that he had a client for the ground in question, and produced the agreement signed by Berry; that he read it over and said to Roberts and Mulock, "We have Berry's signature, and we can't go back and ask him to make a new contract, to sign again." He had either gone away or was going away. "He said you know us, and you know we will make settlement on the day * * *." I said, "You know what happened in the *Cuskaden Case*, when you were two weeks late and we were lenient, and let you go there." I said, "I want time of the essence put in there, because I want you to know we are going to hold you strictly to this agreement." I think Mulock had the check. He said, "Oh, yes, these things only happen once, we will be absolutely certain to get there." I said, "Who is Berry; what is his business." Now, I am not certain whether it was Roberts or

Mulock that said, "He is a wealthy man from Philadelphia now living here." I said, "You know we are not interested in selling to speculators—what is this man's intention to do with the property." Then either Roberts or Mulock made a remark about this man stating he had consulted, or was about to consult, contractors for the purpose of building a garage or show room on this boulevard. *Q.* Who do you mean by "he?" *A.* Berry had. I asked again if he was a man of means and really intended to use the property, and was told again that he was, and then Mr. Stewart and I retired for a moment until we had a conversation between ourselves. We came back from the conversation and I again said we hold you strictly to the day of this time, although time is not of the essence under the contract. Mr. Stewart then signed. I took the check; I took the copy of the contract which had been handed me, and we went away.

Between the date of the agreement and the time for settlement Mr. Roberts called Mr. Charlton on the 'phone and asked for an extension for a couple of weeks, which request, after consultation with Stewart, was refused.

Mr. Stewart testified: "I think we were in Ulizio's office for about fifteen minutes, talking about some ground at Trenton and Atlantic avenues which we were trying to trade for the Waggoner Hospital. After we came out Mr. Mulock said, 'I have an offer of $125 a foot for Albany avenue.' I said, 'No, I don't think I will consider that on Albany avenue. I wouldn't give it a thought.' One word led on to another, then, finally, showed me the agreement. They said, 'You better sign this now, everything is alright.' I read the thing over; the first thing I noticed about the agreement that time of the essence was not in there. I asked why that was not in there. Mr. Roberts spoke up and said that was an oversight on their part. He said this party is alright, and it will be alright. I said that will have to be in before I sign it. Mr. Roberts then spoke up and said this man had made a good deal of money and now he is living down here. This agreement he had shown me; it already had been signed and witnessed. He said Berry was just leaving town and he

didn't want to go back to him with a new agreement. I said I wanted a few minutes to talk to Charlton. Charlton and I went to one side and talked this matter over. The result of it was I signed the agreement." The following questions and answers followed: *Q.* There was no conversation as to who Berry was? *A.* Yes, sir; I asked who Berry was. *Q.* Who did they say he was? *A.* Mr. Roberts told me he was a wealthy man from Philadelphia and was living down here now. I asked what his idea was to do with the ground. He told me his idea was to put up a nice building, sort of an automobile showroom and a garage. I said, "Are you sure?" I said, "I want no speculation with my ground. I can speculate with it myself." He said, "There is nothing of that sort in the deal, this man is perfectly O. K." *Q.* You believed, did you, that Mr. Berry was going to build a building on this ground? *A.* I had no reason to doubt either Mr. Mulock or Mr. Roberts. *Q.* Now, you say you had said you wanted time as the essence of the contract—did Charlton say anything about when settlement was to be made? *A.* Mr. Charlton told them he would insist on settlement on the 23d day of April. In other words, live up to the contract word for word. He also told them, "You know we helped out with the Cuskaden matter—you were two weeks late, and we let you get away with it that time. There will be no extension in this contract." *Q.* You mean no delay? *A.* No delay in this contract. Mr. Roberts insisted everything would be O. K. *Q.* After the signing of the agreement, on the 23d day of April or February, was there ever a time when the question of extension of time was discussed? *A.* The only time the question of time was discussed with me was to Mr. Charlton. I have never seen Mr. Mulock or Roberts to talk to since the 25th day of April. That was in the Waggoner Hospital, outside of two days ago I met Mr. Roberts in Charlton's office. That is the first time I have seen them to speak to.

On the 23d day of April Stewart appeared at the office of the title company, where the settlement was to be made with the deed, prepared to make the settlement. He went there at eleven o'clock, back again at one-thirty and back again at

two-thirty, and then remained until, possibly, five o'clock. Neither Berry, nor anyone representing him appeared, and Stewart made no effort to get into communication with him, and states that certain things had happened; he did not consider "it was his place to notify them;" that he was there prepared to make settlement, because he felt he was compelled to make it irrespective of what he knew.

Mulock testified that he ordered the search for the settlement for Mr. Berry, and that the title company gave him April 24th for settlement.

Mr. Ulizio, of Berg & Ulizio, testified as follows: "Mr. Charlton and Mr. Stewart came to my office to see me on a business matter, talked to me for awhile, about half-past five or six o'clock. I was just about getting ready to go home. As I stepped out of my private office into the main office, there was Mr. Stewart, Mr. Charlton, Mr. Mulock, Mr. Roberts, and I don't know whether there was anybody else there or not. They were having a discussion about an agreement. I said, 'What's the argument?' Somebody said, 'About Mr. Berry.' I don't remember the exact words, but Mr. Stewart didn't want to sign the agreement for some reason or other. I said, 'Why not, is anything wrong with it?' Then they related about another piece of ground—I don't know the piece of ground—something about being late, and I turned to Mr. Mulock, 'Herman, what about this.' He said, 'Oh, this is alright, Berry will settle. He will settle on the date. This is absolutely alright.' I said, 'Stewart go on, if Herman says it is alright, it is alright, isn't it.' They were discussing the date of settlement and time. Something about being late on somebody else. I didn't get it clear. I was about going home; it was something about the time or another purchase of being late, and Tom said we won't wait a day with it, or Charlton said it, I don't know which it was, either one. They were all talking about the time. I got in just about the middle of the discussion. I wasn't there from the beginning. Something about a building, or something. Q. You heard some talk with reference to a building? A. Yes, sir; they said the man was going to build or he was going to build, I don't

know. He was going to build, and he had to settle, and the mortgage was to be taken before the time. *Q.* In other words, you heard either Mr. Mulock or Mr. Roberts discussing a question of the erection of a building on this piece of property? *A.* They were all talking about it. I don't just know which was talking about it. *Q.* Did you, at that time, know who Berry was? *A.* No, I did not. *Q.* At the time of the discussion down at your office, did you have any conversation with Mr. Roberts as to who Mr. Berry was and who was buying this property? *A.* No. *Q.* Did Mr. Roberts tell you what his interest in this property in question was—how he was interested in it? *A.* Why, some time not so long ago he said he was interested in a property with Berry. That is only lately—some months after that. *Q.* Did that conversation have reference to the property that is now in suit? *A.* Yes, that was it. Somebody, I don't know whether it was Mr. Mulock or Roberts, 'I thought Stewart was a friend of yours.' I said, 'Why, what's the matter?' They told me about this party being late or something of that kind, and they said the girl had made a mistake at the title company—had a mistake of the date—I don't know just how it was. They talked to me about it. I said, 'If we made a mistake, we are responsible for it.' They said they didn't know how Mr. Berry was going to take it. He was a Philadelphia man and he was buying a lot of stuff and had a lot of money, and they were afraid of getting in wrong with Mr. Berry, and I said, 'Why, if we are in the fault, we will have to stand for our mistake.' I said, 'I will go to see John Reed,' then Mulock talked about it. I heard no more about it until this morning. Stewart came down and subpœnaed me about it. That's all I know about it. *Q.* Did Roberts ever tell you anything with reference to whether he, Roberts, was directly interested in this deal with Berry? *A.* Yes, he told me that just—just when—I don't remmber. The discussion came out—we were talking about different properties. I wanted Berry to come in on something and he said another time. He was interested with Berry in this thing and would

like to get it straightened out. *Q.* Did he say how he was interested with Berry? *A.* No, he didn't say that."

Mr. Barrett, the secretary of the title company, testified that "Mulock ordered the search and asked if it could be finished up on the 24th of April, and we gave them the date to correspond with the application."

Mulock testified that they made no misrepresentation, and Roberts denies Charlton's testimony as to the representation that was made as to who Berry was, and what he was going to do with this property. On April 24th, Berry and his representative was at the title company, prepared to make settlement, and so notified Stewart, who refused to convey, basing the refusal estirely upon the ground that "time was of the essence of the contract," and that the date of settlement was April 23d.

Time was not made of the essence by the contract itself, and, from the testimony, I am not satisfied that it was ever so made. The complainants were ready to complete their contract, and did tender themselves ready to do so on the day following the time set forth in the contract. I am convinced that that delay was through an error as to the time. The defendant evidently hoped that settlement would not be made on the day fixed, and, evidently, did not call complainant's, or his representative's, attention to their error in time, in order that he might claim a default in the settlement. I am convinced that the prayer of the bill should be granted, and will advise a decree to that effect.